```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
```

Christopher E. Ash, Sr.,            :

    Plaintiff,                   :

  v.                               :     Case No. 2:11-cv-135

                                             :     JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,         Magistrate Judge Kemp

    Defendant.                   :


                    REPORT AND RECOMMENDATION

                       I.  Introduction

    Plaintiff, Christopher E. Ash, Sr., filed this action seeking review of a decision of the Commissioner of Social Security partially denying his applications for social security disability benefits and for supplemental security income.  Those applications were filed on May 9, 2006, and alleged that plaintiff became disabled on May 1, 2003.

    After initial administrative denials of his claim, plaintiff was given a hearing before an Administrative Law Judge on April 28, 2009.  In a decision dated June 9, 2009, the ALJ denied benefits for the time period between May 1, 2003 and November 17, 2008, during which plaintiff's age category was either "younger individual age 18-44" or "younger individual age 45-49," but granted benefits from November 17, 2008 forward, when plaintiff's age category became "closely approaching advanced age."  That determination became the Commissioner's final decision on December 15, 2010, when the Appeals Council denied review.

    After plaintiff filed this case, the Commissioner filed the administrative record on July 18, 2011.  Plaintiff filed his statement of specific errors on September 19, 2011, to which the Commissioner responded on December 19, 2011.  Plaintiff filed a

reply brief on January 6, 2012, and the case is now ready to decide.

　　II.　Plaintiff's Testimony at the Administrative Hearing

Plaintiff's testimony at the administrative hearing is found at pages 30 through 73 of the record.  Plaintiff, who was 50 years old at the time of the hearing and is a high school graduate with some college, testified as follows.

Plaintiff's last job was seasonal employment through a temporary agency.  Before that, he worked for several months for a company which made fiberglass boat covers, a job which required him to be on his feet all day and to lift up to 30 pounds.  He had also worked on and off for 30 years as a basketball coach, and worked as a pressman for a printing company and as an inspector at a car parts factory.

Plaintiff testified that various factors have prevented him from working, including his weight, his knees and some psychological difficulties.  He first received mental health treatment in 2002, and had been receiving counseling continuously since 2006.  His knees were his worst physical problem, and he had undergone knee surgery three times.  The temporary job he performed in 2005 involved twelve-hour shifts, and his knees and feet were affected by that work.  However, he left that job only when the temporary assignment ended.  He had also had a heart procedure recently, and was staring to feel better.

Because of his knees, plaintiff said that both walking and standing affect him.  He could walk for fifteen minutes at a time but standing in one place was painful, even for ten or fifteen minutes.  He could sit as long as he had room to stretch out his legs and as long as he could get up every 30 to 40 minutes.  He was experiencing tingling and numbness in his right hand due to carpal tunnel syndrome, and occasionally would drop things.  He could do routine lifting, such as a bag of groceries or the

trash, but could not bend at the knees and had trouble climbing stairs. Walking on uneven ground was also problematic.

Plaintiff identified a problem with alcohol, beginning about 1999 or 2000. He also developed a cocaine habit, but had not used since 2005, nor had he drunk alcohol since 2008. He described his mental state as a lack of patience with others and an adverse response to pressure. He has been in fights and has had difficulty getting along with people at work. Occasionally he has spells of anger or rage.

In a typical day, plaintiff would watch one of his children before school, watch television or nap, care for the child again from noon until mid-afternoon, read, watch more television, and sleep. He has difficulty sleeping at night due to worries and naps on a daily basis. He does some small amount of grocery shopping, usually with his caseworker, and washes dishes, but does not do major grocery shopping or laundry.

### III.  The Medical Records

The medical records in this case are found beginning on page 279 of the administrative record. The pertinent records can be summarized as follows. Because plaintiff does not take issue with the way in which the ALJ evaluated his physical impairments, this summary will focus primarily on records relating to his psychological impairments.

In 2006, plaintiff sought treatment for depression from Moundbuilders Guidance Center. At that time, he was perceived as struggling with both depression and alcoholism. He was referred to AA and was to be assigned to a physician. He also began attending individual psychotherapy sessions, and by June of that year he had been sober for about a month. He apparently did not follow through, however, on a recommendation for an intensive outpatient program for chemical dependency.

In September of 2006, Dr. White, a consultative examiner,

evaluated plaintiff at a clinical interview.  He reported symptoms of fatigue, changes in appetite and eating habits, weight loss, feelings of helplessness and hopelessness, loss of interest in activities, crying spells, isolation, and irritability.  He also described some anxiety and a history of suicidal ideation with an attempt.  He had been diagnosed in 2006 with alcohol and cocaine dependence.  At the interview, plaintiff was described as "bleary-eyed" and smelling of beer.  He appeared tired and his eye contact was poor.  His ability to deal with social situations appeared to be below average.  He was diagnosed with polysubstance abuse and an adjustment disorder as well as antisocial personality disorder.  Dr. White rated plaintiff's GAF at 60 and believed plaintiff could maintain attention, concentration, persistence and pace to perform simple, repetitive tasks, but would be somewhat impaired in his ability to relate to others.  He had only a mild impairment in his ability to withstand the stress and pressure of work activity, and part of that was attributed to his substance abuse disorder.  (Tr. 358-64).

A state agency reviewer, Dr. Casterline, reviewed plaintiff's records and reported that, from a psychological viewpoint, plaintiff suffered from a depressive disorder, a personality disorder, and a substance addiction disorder.  She thought he was moderately limited in his ability to understand, remember, and carry out detailed instructions and in his ability to complete a work day or work week without interruption from psychologically-based symptoms, but any other limitations were not significant.  (Tr. 377-95).  That assessment was affirmed by another state agency reviewer, Dr. Orosz.  (Tr. 460).

There is a note in the file dated January 25, 2007 from Dr. Borders, who apparently was the psychiatrist assigned to plaintiff at the Moundbuilders Guidance Center.  That note

reflects diagnoses of major depression, moderate to severe, intermittent explosive disorder, a history of alcohol dependency in partial remission, and a history of cocaine dependence in full remission. Plaintiff was to continue therapy with his counselor and his medication was increased. (Tr. 406). A prior note rated plaintiff's GAF at 49, but at a high of 52 in the past year. (Tr. 412).

There are some records indicating emergency room visits by plaintiff in 2007 and 2008. They appear to relate to situations where he had been drinking and made threats or suggestions concerning harming himself. Counseling notes from 2008 reiterate his diagnosis of major depression and intermittent explosive disorder. Dr. Borders saw him on a number of occasions in 2008 and rated his GAF as ranging from 50-58. (See, e.g., Tr. 626, 627, 629, 631, 635. 637). Plaintiff's depression was rated as mild to moderate. In a note from August, 2007, Dr. Borders stated that he was going to send in disability forms because he believed that, due to agitation and depression, plaintiff could not maintain a schedule and would be distracted by anyone in his environment. (Tr. 638). That note concluded that plaintiff "cannot work in any capacity."

Dr. Forman apparently became plaintiff's treating psychiatrist in 2008. She completed a form for the Ohio Department of Job and Family Services on January 29, 2009, indicating diagnoses of major depression, recurrent; rule out bipolar disorder; and intermittent explosive disorder. She also listed his medications and certified his dependency on those medications. She noted that her diagnoses were based on both subjective and objective information, and said that his conditions began in 2000 and that his anticipated date of recovery was "indefinite." She believed he was unable to perform any type of work. (Tr. 729-30). She also prepared a functional

-5-

capacity assessment indicating that he had marked or extreme limitations in six areas of work-related functions, including the ability to make it through a normal work day or work week without interruptions from psychologically-based symptoms.  (Tr. 727).

### IV.  The Vocational Testimony

Ms. Daoud, a vocational expert, also testified at the administrative hearing.  Her testimony begins at page 71.  She testified that plaintiff's past relevant work as a welder and assembler is usually done at the medium exertional level, although plaintiff may have performed it at the light level, and it was skilled work.  He also did a job that ranged from medium to very heavy, which was unskilled, and had another skilled job, quality control technician, which was light work.  The molding machine operator job was medium and skilled, as was the press operator job, although, again, plaintiff may have done it at the light exertional level.  Finally, the temporary seasonal job, packager, is medium and unskilled, and the coaching job is medium and skilled.  None of the job skills which plaintiff used would transfer to sedentary work.

Ms. Daoud was asked to assume that plaintiff could work at the sedentary exertional level.  If that were so, he could do a number of sedentary unskilled jobs such as information clerk, order clerk, or bookkeeper clerk.  If he also were limited to doing simple repetitive tasks where interaction with other workers was limited, a number of jobs would still be available, such as the bookkeeper clerk job, surveillance system monitor, inspector, addressing clerk, and packager.  There were about 150,000 such jobs nationally.  Someone who had to stretch for two to three minutes after forty minutes of sitting could still do these jobs.  A person who had some limitation on fingering done with the dominant hand could not do the inspector or bookkeeping clerk jobs, but could do some unskilled assembler jobs.  Those

-6-

jobs would number about 20 in the Columbus region and about 3,850 nationally.  Finally, she testified that there was no real way to break down these numbers between full-time and part-time jobs.

V.   The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 13 through 24 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff met the insured status requirements of the Social Security Act through September 30, 2007, but not afterward.  Second, the ALJ found that plaintiff had not engaged in substantial gainful activity from his alleged onset date of May 1, 2003 through the date of the decision.  As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including bilateral pes cavus deformity of the feet, bilateral arthritis of the knees, periodic atrial fibrillations, degenerative arthritis of the lumbar spine with narrowed disk spaces at L2-3 and L3-4, depression not otherwise specified, antisocial personality disorder, intermittent explosive disorder, and polysubstance abuse.  The ALJ also found that these impairments did not meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to perform sedentary work as long as that work did not require the use of foot controls, and if the work involved only simple, repetitive tasks that had limited production pressures and which did not involve more than limited contact with co-workers.  These restrictions precluded plaintiff from performing any of his past relevant work.  However, based on the vocational expert's testimony, the ALJ found that prior to turning 50,

plaintiff could perform a substantial number of jobs existing in the national economy, such as bookkeeping clerk, surveillance system monitor, inspector, machine packager, hand packager, and addressing clerk.  As a result, the ALJ concluded that plaintiff had not demonstrated an entitlement to benefits for the time period prior to November 17, 2008.  After that date, he was deemed disabled pursuant to Rule 201.14 of the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2, and was awarded benefits, but this award applied only to his supplemental security income claim and not his claim for disability benefits due to the expiration of his insured status on September 30, 2007.

     VI. <u>Plaintiff's Statement of Specific Errors</u>

In his statement of specific errors, plaintiff raises two issues.  First, he argues that the ALJ did not properly consider all medical source information in accordance with SSR 96-2p and 20 C.F.R. §404.1527(d).  Second, he asserts that the decision made at step five of the sequential evaluation process - that there were significant numbers of jobs which could be performed by a person with plaintiff's physical and psychological limitations - was improperly based on consideration of part-time jobs or otherwise not supported by substantial evidence.  The Court generally reviews the administrative decision under this legal standard:

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere

-8-

scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

    In support of his first claim of error, plaintiff identifies two treating sources whose opinions, he argues, were not properly evaluated. One is Dr. Forman, plaintiff's treating psychiatrist in 2008 and 2009, and the other is Dr. Borders, who provided treatment from 2006 to 2008. Plaintiff makes two different arguments about the way in which the ALJ dealt with these opinions. As to Dr. Forman, he asserts that the ALJ erroneously dismissed her opinion as irrelevant because it was not rendered until 2009, a date after the ALJ decided plaintiff was disabled, but that Dr. Forman actually discussed plaintiff's impairments going back to 2000. As to Dr. Borders, plaintiff argues that the ALJ's failure to address, or even acknowledge, the existence of his opinion as to disability was erroneous.

    A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. Lashley

-9-

v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. Bull v. Comm'r of Social Security, 629 F.Supp. 2d 768, 780-81 (S.D. Ohio 2008), citing Cornett v. Califano, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979).

   A physician's statement that plaintiff is disabled is not determinative of the ultimate issue.  The weight given such a statement depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. §404.1527; Harris v. Heckler, 756 F.2d 431 (6th Cir. 1985).  In evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).

   If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference.  Harris, 756 F.2d at 435.  The Commissioner may have expertise in some matters, but cannot supplant the medical expert.  Hall v. Celebrezze, 314 F.2d 686, 690 (6th Cir. 1963). The "treating physician" rule does not apply to a one-time examining medical provider, and the same weight need not be given to such an opinion even if it favors the claimant.  Barker v. Shalala, 40 F.3d 789 (6th Cir. 1994).

If the Commissioner does not give controlling weight to the opinion of a treating physician, the Commissioner is required to explain what weight has been assigned to that opinion, and why. Failure to articulate the reason for discounting such an opinion with a level of specificity that allows the claimant to understand why his physician's views have not been accepted, and to allow the Court to review the ALJ's bases for making that decision, is almost always reversible error. Rogers v. Comm'r of Social Security, 486 F.3d 234, 242 (6th Cir. 2007); Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

Plaintiff's characterization of the ALJ's decision is correct as it relates to the opinions of both Dr. Forman and Dr. Borders.  The ALJ stated that he gave "significant weight" to the assessment done by Dr. Casterline, and some weight to the consultative examination report prepared by Dr. White, in determining plaintiff's mental residual functional capacity.  He made no mention at all of Dr. Borders.  The administrative decision then concludes:

> It is noted that there is no treating source evaluation with respect to the claimant's mental limitations until January 2009.  At that time, a medical functional capacity assessment describing mental functioning was completed by Dr. Forman.  (Exhibit 32 F).  Thus, during the period of time up to November 17, 2008 when the claimant was not disabled by his physical limitations alone, there are no evaluations with respect to this mental limitations to compete or compare with the assessments described above.

(Tr. 20).

This statement is clearly incorrect, and the Commissioner does not really argue otherwise.  However, the Commissioner asserts that any error committed by the ALJ was harmless.  For the following reasons, the Court cannot accept that contention.

Beginning with the more serious of the two errors - that relating to the complete absence of any discussion of Dr.

-11-

Borders' opinion as to disability - the Commissioner offers two reasons for treating this error as harmless.  First, the Commissioner claims that Dr. Borders cannot really be considered a treating source at the time he rendered his opinion because he had only seen plaintiff a few times up to that point.  Second, the Commissioner argues that this is the type of opinion which is so patently devoid of support that it falls within <u>Wilson's</u> narrow exception dealing with when the failure to follow the dictates of §404.1527(d) does not justify a remand for compliance with that regulation's mandatory terms.  Neither of these arguments is persuasive.

The concept of which doctors are "treating sources" is subject to a regulatory definition found in 20 C.F.R. §404.1502.  That regulation provides that a treating source is "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  An ongoing treatment relationship exists when "you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."  There appears to be no question that Dr. Borders could qualify as a treating source under this regulation.

The first note in the file from Dr. Borders is dated December 13, 2006.  A nurse's note shows that medication was issued that day, (Tr. 410), and Dr. Borders' note of January 5, 2007 indicates that he discussed various matters with plaintiff.  That note also has a handwritten notation to the effect that plaintiff could not work at that time because of his mood swings.  (Tr. 411).  As discussed above, Dr. Borders also met with plaintiff on January 25, 2007.  There are also a fair number of treatment notes which post-date the August 29, 2007 opinion of

disability.  The August 29 treatment notes indicate that plaintiff had discontinued treatment for a time for financial reasons.  The totality of the records show that plaintiff was in counseling and treatment at Moundbuilders since sometime in 2006 and that Dr. Borders was his treating psychiatrist.  It is typical for patients who are in counseling to see social workers or counselors more frequently than psychiatrists, who are more likely to be involved in medication management than individual counseling, so that the frequency with which Dr. Borders saw plaintiff appears consistent with the usual practice for that type of treatment.  Consequently, to the extent that the Commissioner argues that the ALJ was entitled to treat him as a non-treating source (although the ALJ never made a specific finding as to Dr. Borders' status), the Court rejects that argument.  See, e.g., Cole v. Astrue, 661 F.3d 931 (6th Cir. 2011)(psychiatrist who saw claimant for medication management for a two-year period from 2002 to 2004 was a treating source when she rendered an opinion as to disability six months after the relationship began); see also Puckett v. Comm'r of Social Security, 2011 WL 4366665 (S.D. Ohio September 19, 2011)(holding that a psychiatrist who saw the claimant infrequently due to the fact that the claimant "was forced to receive his health care from a free-clinic type facility where physicians come and go with greater frequency than in a privately run facility" should not be penalized for that, and that the psychiatrist's access to earlier treatment notes from the facility qualified him as a treating source).  At a minimum, the ALJ should have acknowledged the existence of an issue about whether Dr. Borders was a treating source and made findings on that issue, but that did not happen here.

     Given the fact that Dr. Borders either qualified as a treating source, or that there was evidence from which that

finding could have been made, it was incumbent on the ALJ to deal with his opinion in some way. As the Commissioner notes, there is a narrow exception to the requirement that the ALJ articulate reasons for giving little or no weight to the view of a treating source, but as the Court of Appeals has held, "the harmless-error inquiry require[s] more than a showing that the claimant simply had little chance of winning on the merits." Bowen v. Comm'r of Social Security, 478 F.3d 742, 747 (6th Cir. 2007). Bowen regarded the complete failure even to mention a treating source's opinion as a significant "transgression" of §404.1527(d), and held that the absence of "even a passing reference to [the treating source's] opinion in the ALJ's decision" does not allow the court "to infer that the ALJ intended to indirectly attack it," thereby satisfying the regulatory goal that rejections of opinions of treating sources be explained in some fashion for the benefit of both the claimant and the reviewing court. Id. at 749. Finally, the Court agrees with plaintiff that Dr. Borders' opinion is not so patently deficient that there is no chance the ALJ would have given it any weight. For these reasons, a remand for further consideration of this issue is required.

It is likely, though not certain, that the ALJ's failure to recognize that Dr. Forman also expressed an opinion as to disability within the relevant time frame (i.e. prior to November 17, 2008) would independently require a remand. Again, the issue here is not so much whether Dr. Forman's view on that issue should have been accepted by the ALJ, but whether it should have been acknowledged and discussed in the administrative decision. The ALJ appears to have found that Dr. Forman was a treating source (and she became one as early as November 24, 2008, see Tr. 620), and Dr. Forman clearly believed that plaintiff had suffered from ongoing problems since 2000; she had access to his records at Moundbuilders since 2006; and she said that his condition was

disabling.  Perhaps the reasons articulated by the Commissioner in the memorandum filed in this Court would justify discounting her view to some extent, but the ALJ neither articulated those or any other reasons for doing so, instead concluding (erroneously) that her opinion about disability did not relate back to time frames prior to November 17, 2008.  On remand, the Commissioner will have an opportunity to address this matter as well.

The Court believes that it will also be helpful to address the second assignment of error, which deals with the vocational expert's conceded inability to separate out the total job figures she testified to between full-time and part-time employment.  The argument advanced by plaintiff in this case appears to have been fairly uniformly rejected by the courts which have considered it.  See, e.g., Liskowitz v. Astrue, 559 F.3d 736, 745 (7th Cir. 2009)("Ruling 96-8p does not say, nor do we interpret it to imply, that a VE may permissibly testify only as to the availability of full-time jobs"); McNemar v. Commissioner of Social Sec., 2011 WL 5586378 (N.D. Ohio Nov. 15, 2011).  As Liskowitz explains, the vocational expert may testify to a gross number of jobs, without regard to whether they are full-time or part-time, and if the expert "identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony."  Id. at 746.  Especially given the fact that the sources relied on by vocational experts do not make the differentiation which plaintiff deems to be crucial, as Liskowitz noted, the absence of such information is "a sign that [the claimant] expects too much."  Id. at 745.  Therefore, on remand, there is no need for the ALJ to revisit the information provided by the vocational expert unless the residual functional capacity finding changes in a way that would require new vocational testimony to be given.

VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings, pursuant to 42 U.S.C. §405(g), sentence four.

VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge